1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN SILVA, JR., | Case No. 1:15-cv-00678-LJO-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| SCOTT FRAUENHEIM, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On November 10, 2011, Petitioner was convicted after a jury trial in the Merced County Superior Court of second-degree murder for the benefit of or in association with a criminal street gang (count 1) and active participation in a criminal street gang (count 2). (4 CT[1] 727–28). The trial court sentenced Petitioner to an imprisonment term of fifteen years to life plus two years. (4 CT 803–06). On January 31, 2014, the California Court of Appeal, Fifth Appellate District modified the judgment to provide that execution of sentence imposed on count 2 is stayed pending service of the remainder of the sentence and affirmed the judgment as modified. People v. Silva, No. F064330, 2014 WL 350590, at *18 (Cal. Ct. App. Jan. 31, 2014). The California

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on February 17, 2016. (ECF No. 18).

Court of Appeal denied a petition for rehearing on February 13, 2014, and the California Supreme Court denied Petitioner's petition for review on May 14, 2014. (LDs[2] 10–13).

On May 4, 2015, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). In the petition, Petitioner raises the following claims for relief: (1) the trial court's failure to resolve the jury's confusion regarding the elements of aiding and abetting; (2) the trial court's erroneous instruction that a murder continues until the perpetrators reach a temporary place of safety; (3) the jury inadvertently receiving a legal memorandum that contained extensive discussion on the natural and probable consequences doctrine; (4) ineffective assistance of counsel; and (5) cumulative effect of trial errors. Respondent has filed an answer, and Petitioner has filed a traverse. (ECF Nos. 17, 21).

## II.

## STATEMENT OF FACTS[3]

### *PROSECUTION EVIDENCE*

Shortly after 11:00 p.m. on November 6, 2009, a group of men walked into the Pastime Club in Gustine.[4] In the group were defendant, who was wearing a black T-shirt; Albert Aleman, who was wearing a white T-shirt; Richard Naudin, who was wearing a hoodie; Brandon Carvalho, who was wearing a black and white Raiders jacket; identical twins Mark and Anthony Oseguera, one of whom was wearing a long jacket and thermal shirt, and the other of whom was wearing a long-sleeved white shirt; and Andrew Silva. All were members of the Mongols outlaw motorcycle gang except Silva, who was an affiliate. They appeared to search the bar, then left.

A short time later, Ashley Klug, Sara Galas, Bill James, Denise Gibbons, Amaro Morais, and Jennifer Herbst were in the Gustine Club when a group of men walked in. To Herbst, the men looked like gang members.[5] At least part of the group—including defendant—headed for James, yelling something like, "Mongols, motherfucker, Mongols, Mongols. What's up? Mongols." They surrounded James, who responded, "I don't give a shit" or "I don't give a fuck who you are," and started to take off his jacket. Klug heard the sound of a knife opening. Galas saw defendant make a motion like he was flipping out a knife and she heard a knife open, although she did not see a weapon. Morais saw one of the

---

[2] "LD" refers to the documents lodged by Respondent on February 17, 2016. (ECF No. 18).

[3] The Court relies on the California Court of Appeal's January 31, 2014 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Unspecified references to dates in the statement of facts are to 2009.

[5] Eyewitness estimates of the number of men in the group ranged from four to six, to 12 to 15. Accounts of what the men were wearing also varied. Herbst described one as wearing a gray-and-white plaid flannel shirt, and another as having on a dark gray hoodie. Klug believed all were wearing black and white, with one having on a Raiders jersey. Morais recalled one wearing a black, white, and gray-checkered flannel shirt, and another having on a Mongol "one-percenter" T-shirt underneath a flannel shirt.

men make a motion with his hand, and he heard a "flick" that sounded like a knife.

James had his jacket about halfway off when the man with the gray hoodie struck him in the face and all but one of the rest attacked James. Klug, who was sitting next to James, did not see James actually get stabbed, but when she got home, she found blood on her sweater. Gibbons similarly did not see James get stabbed, but she believed defendant was one of the men who lunged for James.

Morais saw someone between defendant and James, and defendant leaning over, making a motion that kind of went over the top and down on James. The one who Morais believed had a knife was making a thrusting motion. Morais grabbed this man from behind and was trying to pull him off when the man who had not joined in the attack pulled a canister about the size of a small fire extinguisher from inside his shirt and discharged pepper spray or a similar substance.[6] Morais could not see, but he felt everyone "swarming" toward the front door. Morais managed to run out where he saw James standing in the doorway of a white extended-cab pickup. It was parked in one of the parking stalls, the passenger side door was open, and James was fighting with someone in the backseat.

James was throwing punches when defendant, whom Morais described as wearing a white T-shirt with a Mongols insignia on the back, ran up behind James and stabbed him twice in the back with a 10– to 12–inch knife.[7] Defendant then ran behind the truck. He kind of threw his hands up and said something to James, then ran off. Morais did not know where he went; he was looking at James, and all the vehicles took off. James fell to the ground, bleeding badly in several places.

Gibbons saw James collapse. She bent down to see what was wrong with him, and her hands came up "full of blood." She saw a "silverish" extended-cab pickup pull away with the passenger side door partially open. Galas saw the men who had attacked James jump in two or three different vehicles. One was a car, but defendant got in a dark-colored, black or charcoal gray truck. Herbst saw people jumping into a white Chevrolet Tahoe and a gray pickup and quickly driving away.

Gustine Police Officer Warner was the first officer on the scene, arriving shortly after 11:36 p.m. He found James covered in blood and face down, partly in the roadway and partly on the sidewalk, in front of the Gustine Club. A subsequent autopsy revealed James had seven sharp force injuries (stab and incised wounds) to his body.[8] Two of the wounds had an estimated depth of penetration of nine

[6] Klug subsequently identified Carvalho as this person.

[7] Morais initially told police the man who stabbed James outside the bar was the same person who had been yelling "Mongols, motherfucker, what's up" inside, and that this was the person in the black, white, and gray-checkered flannel. Morais also said the same person he saw stabbing James inside the bar was the same person he saw stabbing him outside, but he later said he thought they were two different people. When shown photographic lineups, Morais identified someone (apparently Mark Oseguera, although the record is not clear) as the person who yelled "Mongols, motherfucker," had the folding knife in his hand, and stabbed James in the back while James was fighting someone in the pickup. At trial, however, Morais identified defendant as the one who stabbed James twice in the back outside the bar. Morais explained that sometime after he made the initial photographic identifications and told police the same person stabbed James both inside and outside the bar, he contacted one of the case detectives and said he had been mistaken. He told the detective he was positive the man with the scar on his forehead, whom he had identified, was the person who stabbed James inside the bar, but a different person—defendant—"finished" James outside.

[8] A stab wound is deeper than it is long and, in general terms, involves the insertion of a sharp object. An incised wound is longer than it is deep, and is more of a cutting injury.

3

inches. Of these, one nearly cut the liver in half, passed through the diaphragm and one lung, and nicked the superior vena cava (a large vessel around the heart). The other penetrated the back, entered the abdominal cavity, and incised multiple loops of small bowel. Two of the other wounds had an estimated depth of penetration of four inches. One of these passed through part of one lung. The other penetrated a lung, incised the pericardium, and involved the vital structure near the center of the lung itself. The cause of death was multiple stab wounds. It was possible two or more knives were used. The mechanism of death was bleeding to death, a process that takes time that varies with the underlying health of the person. Given James's wounds, he would have had the ability to continue to move and attempt to defend himself even though he received, what turned out to be, a mortal wound.

At approximately 11:30 p.m., Merced County Sheriff's Deputy Daniel headed from Los Banos toward Santa Nella in search of a white Chevrolet Tahoe last seen headed southbound on Highway 33. As he came down the overpass on Henry Miller Road, he saw a white Chevrolet Tahoe southbound on Highway 33. It was followed so closely by a silver pickup that Daniel equated it to a Nascar race, with the pickup drafting the Tahoe.[9] Both vehicles turned into the parking lot of the Ramada Inn (now, the Hotel De Oro), then the Tahoe went north and the pickup went south.

As Daniel came around the north side of the hotel and approached the Tahoe, four to six males ran around the vehicle then they went into the hotel.[10] Daniel backed into the corner of the parking lot, where he could watch the Tahoe, and called for additional units. The men did not return. A group of 10 or more other men came out and were in the breezeway adjacent to the vehicle, but they never actually approached the Tahoe. Two males, a Hispanic female, and a White female exited the upstairs east wing of the facility. The White female came down the stairwell, opened the Tahoe with a remote, retrieved some items, and went back upstairs. She made three trips in all, then went back inside, followed by the Hispanic female and the two males.

After other officers arrived and established a perimeter, an approximately 16–inch–long sheath or scabbard that said "Mongols" was found lying in front of the Tahoe. Near the sheath was a black beanie/watch cap with a red stain on it that could have been blood. Another black beanie was found on the south side of the parking lot.

The Tahoe and the pickup were impounded and processed for evidence. James's blood was found in several locations both inside and outside the pickup, on the passenger side. Although defendant was excluded as a possible contributor to any of the blood samples taken from the pickup, his thumbprint was found on a snack bag inside the vehicle. James's blood was also found in several locations inside the Tahoe, as was blood from Mark or Anthony Oseguera.[11]   Defendant was

---

[9] Evidence presented at trial concerning the pickup became needlessly confusing when, although both counsel stipulated the pickup was a GMC and some witnesses so referred to it, it became apparent the vehicle almost certainly was a Chevrolet, as other witnesses referred to it. To the extent possible, we will refer to the two vehicles as the pickup and the Tahoe.

[10] Daniel did not see anyone actually get out of the Tahoe. He was aware the Mongols were in town that weekend for an annual event, that they habitually rented most of the rooms at the hotel for the occasion, and that they used their own members to provide security.

[11] Stephen Cavanaugh, the senior criminalist for the Department of Justice who performed the DNA analysis, explained that because Mark and Anthony Oseguera are identical twins, they have the same DNA profiles.

excluded as a possible contributor to any of the blood samples taken from the Tahoe. Fingerprints from Aleman and Naudin were found on or in the Tahoe.

The next morning, November 7, a maintenance worker at the hotel found a long-sleeved, white cotton shirt with red stains around the cuff and a large hunting-type knife under the first step of the back stairway at the east end of the building. The knife—which Morais testified "look[ed] very much" like the knife he saw used to stab James in the back—was next to the shirt. Traces of blood belonging to James and Mark and/or Anthony Oseguera were found on the blade. Defendant was excluded as a possible contributor. A mixture of DNA was found on the handle; Anthony and Mark Oseguera were possible contributors, James could not be excluded as a possible contributor, and defendant was excluded as a possible contributor. A black, white, and gray-plaid flannel shirt/jacket, and one or more white T-shirts, were found in a garbage can at a different location at the hotel.[12] Defendant's DNA was found on the collar of one of the T-shirts.

That same morning, a black-handled folding knife was discovered near the street end of one of the parking stalls down the block from the Gustine Club. Traces of James's blood were found on the handle. A DNA mixture of at least three contributors was also found on the knife. Mongol Rafael Valdez was included as a possible major contributor.[13] Defendant was excluded as a possible contributor toward either sample.

Later that day, defendant went to the Gustine Police Department to try to get the pickup released from impound. Defendant, who gave a home address in Whittier, explained he had arrived at the motel about 4:00 p.m. Friday afternoon, and had gone by himself to a bar in Gustine. He could not recall the name of the bar.[14] Defendant related that he walked in to get a drink, saw a commotion and Mace being sprayed, got scared, ran out, and got in the truck. As he started backing out, "some ... dude" started "jumping at" the vehicle and tried to lunge through the window. Defendant "threw [the truck] in reverse" and took off. Nobody was in the vehicle with him. (Full capitalization omitted.) Defendant had Mace in his eyes and could not describe the person, but when he got back to the hotel, he saw blood on the passenger door, which was the side through which the person had tried to gain entry. Defendant used a rag to clean it off. Defendant denied affiliating with the Mongols or having any friends who were Mongols. He denied having seen the individual before or exchanging words with him.

Sergeant Christopher Cervantes of the Montebello Police Department testified as an expert on the Mongols.[15] Cervantes explained that the Mongols are commonly referred to as a "one-percenter gang," meaning they belong to the one percent of American motorcyclists who are not law-abiding. The Mongols (who had 250 to 300 members in 2009) engage in both criminal and noncriminal activities. Their criminal activities include petty theft of motorcycle parts, grand theft of motorcycles, drug sales, firearms proliferation, witness intimidation, violent assaults, and murder. Cervantes testified that, although Mongols have enemies among the Mexican Mafia-affiliated Sureño street gangs in Southern California, their "most bitter and probably bloody rival" is the Hell's Angels, an enmity that

---

[12] When removed from the evidence bag for viewing, the long-sleeved and plaid flannel shirts caused the viewers to react to pepper spray residue.

[13] Cavanaugh explained that because there was so much other information included in the mixture, Valdez's alleles were detected, but Cavanaugh was unable to say conclusively it was Valdez's DNA.

[14] According to Sergeant Hamera, Gustine only had two bars.

[15] We summarize only those parts of Cervantes's testimony that are pertinent to the issues raised on appeal.

5

has endured for years. The Mongols—whom Cervantes characterized as even more violent than the Hell's Angels—"associate [ ] with" the colors black and white, and typically wear any variation of those colors; the Hell's Angels, the colors red and white. Both the Mongols and the Hell's Angels claim Central California as their territory, although the Hell's Angels are a "dominant presence" in Northern California, including the Merced area.

According to Cervantes, it is common for the Mongols to have large parties. Their standard protocol for such events is to rent hotels or other facilities and run their own security. When coming into enemy territory, Mongols are completely self-regulated. They stay where they are at, such as at a hotel they know is going to be safe. In Cervantes's experience, when the Mongols are together in large groups at a hotel or at an event, law enforcement has very few problems with them. When small groups leave and go to bars or other public places, however, simple fights, stabbings, shootings, or assaults occur.

Cervantes related that a "rat pack"—when a person gets jumped or beaten by multiple people—is a common activity of the Mongols. Cervantes testified that Mongols are indoctrinated into an "at war" mindset that is "on guard" for the Mexican Mafia and, more importantly, for Hell's Angels who are to be dealt with "on[ sight]" which "included murder." A Mongol must "jump in" and "protect [their] members" if a member of a Mongols' chapter or organization is involved in any type of physical activity or fight. Mongols are required to carry knives, and weapons may be used even if the victim does not have one. The Mongols' written protocol reminds members that what they do reflects on the club, and to "[n]ever make the club look bad." When someone "disrespects" one Mongol, it is viewed as extending to the whole group. Failing to address the insult makes the club "look bad." Such failure could result in the individual being kicked out of the club. Cervantes explained that a Mongol would not be with the group long if he failed to act. Because "disrespect" to one is "disrespect" to all, if a group of Mongols were together and one was "disrespected," the group would get involved. If they were not armed (for instance, because they were in a bar that checked for weapons at the door), then they would use their feet (kicks), or bottles, or anything similar in the attack. If they were armed, they would "go immediately to" weapons. The entire group would participate in the attack; they are empowered by numbers, acting as a group solidifies their unity. Typically, they would assist each other in getting rid of evidence.

In Cervantes's opinion, going into the Gustine Club and yelling "Mongols, motherfuckers, Mongols, what's up?" was to see "who wanted to disrespect their presence." Given his appearance, James could easily have been mistaken for a Hell's Angel, and his response to the group yelling out their gang name would have been considered disrespectful. In Cervantes's opinion, "disrespect ... ultimately ended up costing ... [James his] life."

Cervantes viewed a video from the Pastime Club and identified the Mongols who walked into the bar. The group did not make contact with anyone inside, nor did they order drinks. Instead, they looked around in "high alert." In Cervantes's experience, they were identifying problems and/or rivals, meaning potential Hell's Angels. Cervantes explained that the group was a "war party." They left the secured hotel, then secured the bar. When nothing sparked their interest, either the presence of Hell's Angels or disrespect, they left. In Cervantes's opinion, the group was "on a hunt." They were in Northern California—where the Hell's Angels dominate—and entered the bar looking for issues. When they found no one, they went on to the next bar. Although a Hell's Angel would be their

preferred victim, anyone disrespecting them would do. Cervantes opined that when the group left the hotel that night, they were "100 percent sure" this type of trouble was possible and that somebody could die, although what occurred was not a planned event.

### *DEFENSE EVIDENCE*

Gary Mendonica was in the Gustine Club at the time of the incident. He was watching television when some kind of aerosol was discharged in the area behind him. He did not recall hearing anyone yell "Mongols" or anything similar. Mendonica ran outside. He did not really see a fight outside, but he saw James stumble out and fall down.

Warner interviewed Morais outside the Gustine Club shortly after the incident. Morais related that one person who came into the club bumped into James, and that James said, "What the fuck motherfucker." Asked if the individuals specifically targeted or went to James, Morais said no.

Merced County Sheriff's Detective Taylor interviewed Morais on November 7. Morais related he was about 20 to 25 feet from the door, and James was about eight feet down from him toward the back, when a group of about six men came "piling in." One, who was wearing a black, gray, and white-checkered flannel shirt, said, "Mongols motherfucker, what's up? Mongols. What's up? What's up? Mongols. Mongols." As the man walked by, Morais saw him reach into his pocket and make a motion, and then heard a sound he knew was a knife. Out of the corner of his eye, he saw James quickly turn around. Morais thought somebody bumped into him, or perhaps it was when the man yelled "Mongols." Whatever the reason, the group went straight to James and were "on him" all at once. The man with the knife looked like he punched James in the upper torso. According to Morais, the group were all wearing Mongol "one-percenter" T-shirts, white with black print, but no vests. Someone discharged pepper spray then they all "rush[ed] out."

Morais related he managed to get outside where he saw a gray or silver extended-cab pickup. The passenger side door was open. James was standing in the door, "cracking" somebody inside the truck. Someone then came from Morais's left. Morais jumped up to grab him, but something happened and Morais fell. When he looked up, he saw the man hit James twice in the back. Morais described the man as five feet seven or eight inches tall, between 180 and 210 pounds, short and squatty, with a "[b]ig mouth on him."[16] This was one of the first men who walked in, and it was the one yelling "Mongols motherfucker, Mongols." The man who hit James did not get into the truck, but got into his own vehicle. There was a white vehicle on the other side of the truck.

Detective Clark talked to defendant shortly after defendant was detained. Clark observed no obvious signs that defendant had been in a fight.

James Hernandez, a professor of criminal justice at California State University, Sacramento, testified as a gang expert. Hernandez disagreed with Cervantes's assessment of the group "storming" the Pastime Club. In Hernandez's opinion, the video simply showed a group of men going into a bar. He opined that they walked toward the restroom to use the bathroom. Based on his review of various reports and other materials, Hernandez did not believe the group left the hotel looking for trouble. He found nothing to suggest James could have been confused

---

[16] On November 22, defendant was five feet eight inches tall and weighed 306 pounds.

with, or identified as, a Hell's Angel. Hernandez disagreed with Cervantes's opinion that the group was a war party, and found nothing unusual in the group looking around their location.

Hernandez did not believe it was necessarily true that every Mongol present would have participated in the stabbing. He explained there were a growing number of situations in which an altercation began and members of the club dragged their own people away. He found a lot of the behavior of the outlaw motorcycle clubs to have changed "drastically" in the few years before trial.

Robert Shomer, an experimental psychologist, testified as an expert on eyewitness identification. He explained that eyewitness identification of a stranger has a low level of reliability, especially if the identification is made under circumstances including a sudden, unexpected event; multiple individuals; high stress; some kind of impairment of the eyewitness such as fatigue, drugs, alcohol, or the focus of attention; the lighting; and the distance. Further, the identification procedure itself, if not done correctly, taints, alters, and sometimes ruins the evidence. The police must get as much information as possible from the witness before showing him or her anything, because showing the witness something alters the evidence. Memory is dynamic and incorporates information obtained from other people. The most accurate reports are the initial reports made by a witness, after he or she has had a little time to calm down. The initial reports do not suffer from memory decay or, to the extent witnesses can be kept from talking to each other, from incorporation of information from other people.

In answer to a hypothetical question based on evidence adduced at trial, Shomer opined the situation was not one in which perceptions would be expected to be highly accurate. If eyewitnesses were shown a video taken at the first location, but no video of the second location where the stabbing occurred, and they were then shown photographic lineups, the procedure would be suggestive and tainting, and likely to change the evidence in the witness's head. The procedure could produce a false identification.

Silva, 2014 WL 350590, at *1–7 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Merced County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

1   enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

2   Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is

3   therefore governed by its provisions.

4          Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

5   barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

10  28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538

11  U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

12         As a threshold matter, this Court must "first decide what constitutes 'clearly established

13  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

14  (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

15  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

16  of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words,

17  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

18  set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

19  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

20  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

21  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

22  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

23  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

24  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

25  end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552

26  U.S. at 126; Moses, 555 F.3d at 760.

27         If the Court determines there is governing clearly established Federal law, the Court must

28  then consider whether the state court's decision was "contrary to, or involved an unreasonable

1    application of, [the] clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72 (quoting 28 U.S.C.

2    § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

3    state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

4    of law or if the state court decides a case differently than [the] Court has on a set of materially

5    indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The

6    word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

7    or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New

8    International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

9    [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

10   governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to"

11   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

12   AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

13       "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

14   the state court identifies the correct governing legal principle from [the] Court's decisions but

15   unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

16   "[A] federal court may not issue the writ simply because the court concludes in its independent

17   judgment that the relevant state court decision applied clearly established federal law erroneously

18   or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>,

19   538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists

20   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

21   <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the

22   correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If

23   the Court determines that the state court decision is objectively unreasonable, and the error is not

24   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

25   effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

26       The court looks to the last reasoned state court decision as the basis for the state court

27   judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d

28   1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially

incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Trial Court's Instructions

#### 1. Trial Court's Response to Jury Question

In his first claim for relief, Petitioner asserts that the trial court failed to resolve the jury's confusion about the elements of aiding and abetting liability, in violation of due process. (ECF No. 1 at 22).[17]  Respondent argues that the state court's denial of the claim was reasonable and

---

[17] Page numbers refer to ECF page numbers stamped at the top of the page.

1   that the trial court's reference to the wrong jury instruction number in its response did not have a

2   substantial and injurious effect or influence on the verdict. (ECF No. 17 at 25).

3       Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth

4   Appellate District, which denied the claim in a reasoned decision. The California Supreme Court

5   summarily denied Petitioner's petition for review. As federal courts review the last reasoned

6   state court opinion, the Court will "look through" the California Supreme Court's summary

7   denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S.

8   Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at

9   806.

10      In denying Petitioner's due process claim with respect to the trial court's alleged failure

11  to resolve the jury's confusion about the elements of aiding and abetting liability, the California

12  Court of Appeal stated:

13  
### RESPONSE TO JURY'S QUESTION

14  Defendant says the trial court violated his due process rights by failing to clear up
    the jury's confusion about the elements of aiding and abetting. We conclude the
15  trial court acted within its discretion.

### A. Background

16  Defendant was tried as an aider and abettor. In pertinent part, the jury was
17  instructed, pursuant to CALCRIM No. 400 (Aiding and Abetting: General
    Principles):

18      "A person may be guilty of a crime in two ways: One, he or she may have
    directly committed the crime. I will call that person the perpetrator. Two,
19  he or she may have aided and abetted that perpetrator who directly
    committed the crime. A person is guilty of the crime whether he or she
20  committed it personally, or aided and abetted the perpetrator.

21      "Under some specific circumstances if the evidence establishes aiding and
    abetting in one crime, and [*sic*] a person may also be found guilty of other
22  crimes that occurred during the commission of the first crime."

23  Pursuant to CALCRIM No. 401 (Aiding and Abetting: Intended Crimes), jurors
    were told:
24  
25      "To prove that the defendant is guilty of a crime based on aiding and
    abetting that crime, the People must prove that: One, the perpetrator
26  committed the crime; two, the defendant knew that the perpetrator
    intended to commit the crime; three, before or during the commission of
27  the crime the defendant intended to aid and abet the perpetrator in
    committing the crime; and four, the defendant's words or conduct did, in
28  fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved the defendant does not need to actually have been present when the crime was committed to be an aider and abettor.

"If you conclude that the defendant was present at the scene of the crime and failed to prevent the crime you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

Finally, jurors were instructed, pursuant to CALCRIM No. 403 (Natural and Probable Consequences (Only Non–Target Offense Charged)):

"Before you may decide whether the defendant is guilty of murder as an aider and abettor you must decide whether he is guilty of assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery.

"To prove that the defendant is guilty of murder as an aider and abettor the People must proof [*sic*] that: One, the defendant is guilty of assault with a deadly weapon, or with force likely to produce great bodily injury, assault or battery, either as a perpetrator or as an aider and abettor;

"Two, during the commission of assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery, a co-participant in that assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery committed the crime of murder; and

"Three, under all of the circumstances a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery.

"A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural or probable, consider all the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the assault with a deadly weapon or with force likely to produce great deadly [*sic*] injury, assault or battery, then the commission of murder was not a natural or probable consequence of assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery.

"To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on that crime.

"The People are alleging that the defendant originally intended to act as a perpetrator or intended to aid and abet the commission of assault with a deadly weapon or with force likely to produce great bodily injury, assault or battery.

"If you decide that the defendant perpetrated or aided and abetted one of those crimes and that murder was a natural or probable consequence of that crime the defendant is guilty of murder. You do not need to agree about which of these crimes the defendant aided and abetted."

During deliberations, the jury sent out the following question: "If Ruben Silva didn't know the people he was with were carrying weapons (knives and more) would simply driving the vehicle away from the scene (with no one with him) meet the test of aiding and abetting?" The trial court's initial reaction was " '[n]o.' " Defense counsel concurred. The prosecutor objected because such a response would invade the jury's duties to determine the facts and apply the law given by the court and, he argued, the court should refer to the instructions on aiding and abetting so the jury would apply the law to the facts in the question. The court agreed, finding its initial proposed response created a risk of influencing jurors on what their factual findings should be. Defense counsel again urged the court to answer the question " '[n]o,' " because under the fact pattern presented, there would be no aiding and abetting. Over defense objection, the trial court told the jury:

"Okay. Ladies and Gentlemen, in response to your question, the Court cannot tell you how to decide the facts. You are the adjudicator and body that decides what the facts are in this matter. Once you decide what the facts are I call your attention to Jury Instruction 400 and 403. Okay.

"400 sets forth the four elements required as an aider and abetter [*sic*] under that section. And 403 sets forth the three elements required under the natural and probable consequences doctrine as to what the law requires, okay.

"That's the best I can provide to you. Okay. Good luck. Thank you."

The next day, the jury returned its guilty verdicts. Defendant subsequently moved for a new trial, in part based on the trial court's failure to answer " '[n]o' " to the jury's question. Following argument, the trial court denied the motion.

### B. *Analysis*

After the jury retires for deliberation, "if they desire to be informed on any point of law arising in the case, ... the information required must be given...." (§ 1138.) "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.] [A] trial court [may be] understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury. [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746; accord, *People v. Hodges* (2013) 213 Cal.App.4th 531, 539.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Applying this test, we find no error. The trial court here did not "figuratively throw up its hands and tell the jury it [could not] help" (*People v. Beardslee, supra,* 53 Cal.3d at p. 97); rather, it considered how best to aid jurors while maintaining neutrality as between the parties. " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' [citation], and jurors are ever watchful of the words that fall from him [or her]. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." (*Bollenbach v. United States* (1946) 326 U.S. 607, 612.) " ' "An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue." ' [Citation.]" (*People v. Assad* (2010) 189 Cal.App.4th 187, 198; see § 1127 ["The court shall inform the jury ... that the jurors are the exclusive judges of all questions of fact submitted to them.... Either party may present to the court any written charge on the law, but not with respect to matters of fact...."].)

We question whether the jury's inquiry truly sought guidance on a point of law. (Compare *People v. Santos* (1990) 222 Cal.App.3d 723, 745–746 with *People v. Loza* (2012) 207 Cal.App.4th 332, 349, 354–355; *People v. Thoi* (1989) 213 Cal.App.3d 689, 697–698 & fn. 5.) "Whether a person has aided and abetted in the commission of a crime ordinarily is a question of *fact.* [Citations.]" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094, italics added.) A trial court's answer to a jury question pursuant to section 1138 is an instruction on the law, not a comment on the evidence, and as such must be neutral. (See, e.g., *People v. Wright* (1988) 45 Cal.3d 1126, 1141.) " 'Questions or illustrations from the jury may be phrased so that a simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when such matters should properly be determined by the jury. Because the jury may not enlist the court as its partner in the factfinding process, the trial judge must proceed circumspectly in responding to inquiries from the jury. The court may properly attempt to avoid intrusion on the jury's deliberations by framing responses in terms of supplemental instructions rather than following precisely the form of question asked by the jury.' [Citations.]" (*Arizona v. Johnson* (9th Cir.2003) 351 F.3d 988, 994, italics omitted; see also *U.S. v. Anekwu* (9th Cir.2012) 695 F.3d 967, 987.)[18] "When a question shows the jury has focused on a particular issue, or is leaning in a certain direction, the court must not appear to be an advocate, either endorsing or redirecting the jury's inclination." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331.)[19]

---

[18] Defendant, while himself citing a number of federal circuit court cases, notes in response to the Attorney General's citation of *Arizona v. Johnson, supra,* 351 F.3d 988, that such cases are not binding on this court. This is true. Such cases can, nevertheless, be persuasive and considered. (*People v. Avena* (1996) 13 Cal.4th 394, 431.)

[19] A trial court may not, consonant with a criminal defendant's right to a jury trial, directly inform the jury that an element of the crime charged has been established, no matter how conclusive the evidence. (See, e.g., *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 315; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1406.) Article I, section 29 of the California Constitution affords the People the right to due process of law in a criminal case. Because the People's rights are not coextensive with a criminal defendant's rights, however (*Miller v. Superior*

Even assuming the jury here was requesting information on a point of law, the trial court's decision not to give a categorical answer was reasonable because, under the hypothetical facts in the jury's question, "no" was not necessarily the correct answer. The jury's question posited defendant was with people, but did not know they were carrying weapons.[20] Defendant did not have to have such knowledge to aid and abet simple assault or battery or assault by means of force likely to produce great bodily injury, or for murder to be a natural and probable consequence of the assault. (See *People v. Medina* (2009) 46 Cal.4th 913, 921–923.) And, while *mere* presence at the scene of an offense is insufficient to constitute aiding and abetting (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407), " 'one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere,' " is a principal in the crime committed (*People v. Swanson–Birabent* (2003) 114 Cal.App.4th 733, 743–744). Advance knowledge is not a prerequisite for aiding and abetting liability. (*Id.* at p. 742.) To answer the jury's question "no" and have that direct answer be legally correct, the trial court would have been constrained either to explain that a negative answer applied only under particular factual circumstances, or how presence could constitute aiding and abetting. Either explanation could have had a harmful, rather than clarifying, effect as far as defendant was concerned. (See *People v. Hill* (1992) 3 Cal.App.4th 16, 25, disapproved on another ground in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.)

"Where, as here, the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) Under the circumstances, the trial court here acted reasonably in referring the jury back to the aiding and abetting instructions. (See *People v. Gonzalez, supra,* at p. 1213.)

Defendant says, however, that the trial court erred by specifically calling the jury's attention to CALCRIM Nos. 400 and 403, rather than CALCRIM No. 401, which set out the elements of aiding and abetting.[21] Although the court may have misspoken as to the number of the instruction that contained the elements, its reference to "the four elements required" advised jurors of what they should go back and consider again. Nothing in the record suggests jurors remained confused after following the court's direction or could not find the information to which the court referred them, or that the trial court's response somehow discouraged them from asking additional questions if they had any. (See *Weeks v. Angelone* (2000) 528 U.S. 225, 234; *People v. Beardslee, supra,* 53 Cal.3d at pp. 96, 98.)

We conclude the trial court did not abuse its discretion in responding to the jury's question by referring jurors back to the original, correct instructions rather than directly and categorically answering. We further conclude any error in the court's

---

*Court* (1999) 21 Cal.4th 883, 896), we assume without deciding that, under proper circumstances, a trial court could inform a jury that an element of the crime charged or basis for liability has *not* been established.

[20] Defendant says the hypothetical facts "almost exactly matched the account" given by defendant to law enforcement. In the hypothetical, however, defendant was with other people, while when interviewed by Hamera, defendant said he went to the bar alone. This is a small difference, perhaps, but potentially a significant one in terms of aider and abettor liability.

[21] The record contains a certified settled statement of the in-chambers discussion concerning the appropriate response to the jury's question. Although it is clear defense counsel objected to the trial court not responding directly to the jury's question, we cannot tell whether counsel objected on the particular ground defendant now raises. Under the circumstances, we will not find the issue forfeited by failure to object.

specification of instructions was harmless. Even if we consider the error a failure adequately to answer the jury's question, it did not constitute a failure to instruct on all elements of an offense or of aiding and abetting liability in light of the instructions originally given.[22] Accordingly, it is subject to the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Hodges, supra,* 213 Cal.App.4th at p. 539; *People v. Eid* (2010) 187 Cal.App.4th 859, 882.) There is no reasonable probability defendant would have obtained a more favorable result had the trial court specified CALCRIM No. 401. There was manifestly no due process violation. (See *Weeks v. Angelone, supra,* 528 U.S. at pp. 231–232; *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73.)

*Silva*, 2014 WL 350590, at *7–11 (footnotes in original).

The Supreme Court has held that the Constitution generally requires nothing more from a trial judge than to respond to a jury's question "by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry." Weeks v. Angelone, 528 U.S. 225, 234 (2000). "A jury is presumed to follow its instructions. Similarly, a jury is presumed to understand a judge's answer to its question." Id. If the jury does not ask a follow-up question to the judge's response, the Court "presume[s] that the jury fully understood the judge's answer and appropriately applied the jury instructions." Waddington v. Sarausad, 555 U.S. 179, 196 (2009) (citing Weeks, 528 U.S. at 234).

The California Court of Appeal found that any error in the trial court's specification of the applicable instruction was harmless pursuant to the federal constitutional standard set forth in Chapman v. California, 386 U.S. 18 (1967). Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is,

---

[22] "When an instruction tells the jury it may convict the defendant on a theory he or she aided and abetted in commission of the offense, but omits one or more of that theory's necessary findings, the error may be deemed equivalent to omitting an element of a charged offense. [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 490; see *People v. Beeman* (1984) 35 Cal.3d 547, 555, 561.) Such error is of constitutional dimension and so is analyzed under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1226–1227; *Martinez v. Borg* (9th Cir.1991) 937 F.2d 422, 423.)

1  Petitioner must show that the state court's harmless error determination "was so lacking in

2  justification that there was an error well understood and comprehended in existing law beyond

3  any possibility of fairminded disagreement." Ayala, 135 S. Ct. at 2199 (internal quotation marks

4  omitted) (quoting Richter, 562 U.S. at 103).

5      In the instant case, the trial court responded to the jury's question by referring them to the

6  court's original instructions. Although the trial court mistakenly referred to CALCRIM No. 400

7  rather than CALCRIM No. 401, the court made clear that the pertinent instruction "sets forth the

8  four elements required as an aider and abetter [sic] under that section." (7 RT[23] 1364).

9  CALCRIM No. 401 clearly sets forth four elements "[t]o prove that the defendant is guilty of a

10  crime based on aiding and abetting that crime" whereas CALCRIM No. 400 discusses the

11  general principle that a defendant may be guilty by directly committing a crime or aiding and

12  abetting a perpetrator. (4 CT 704–05). As the jury did not ask follow-up questions to the judge's

13  response, it is presumed that the jury understood the judge's answer and appropriately applied

14  the correct jury instruction. See Waddington, 555 U.S. at 196.

15      Based on the foregoing, the Court finds that the state court's denial of Petitioner's due

16  process claim with respect to the trial court's failure to resolve the jury's confusion was not

17  contrary to, or an unreasonable application of, clearly established federal law, nor was it based

18  on an unreasonable determination of fact. The decision was not "so lacking in justification that

19  there was an error well understood and comprehended in existing law beyond any possibility for

20  fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

21  habeas relief on his first claim, and it should be denied.

22      2.  CALCRIM No. 3261 Instruction

23      In his second claim for relief, Petitioner asserts that the trial court erroneously instructed

24  the jury that a murder continues until the perpetrators reach a place of temporary safety, in

25  violation of due process. (ECF No. 1 at 26). Petitioner appears to argue that the instruction

26  improperly allowed the jury to find aiding and abetting liability even if Petitioner did not form

27  the requisite intent, or perform the necessary act, until after the murder had already been

28  _____
[23] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on February 17, 2016. (ECF No. 18).

completed (i.e., while Petitioner and the others were on their way back to the hotel). Respondent argues that the instructional error was harmless and did not have a substantial and injurious effect on the verdict. (ECF No. 17 at 34).

Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's due process claim with respect to the trial court's CALCRIM No. 3261 instruction, the California Court of Appeal stated:

> ### CALCRIM NO. 3261
>
> For unknown reasons, the trial court followed the instructions on the natural and probable consequences doctrine with a modified, truncated version of CALCRIM No. 3261 (In Commission of Felony: Defined—Escape Rule), which told jurors: "The People must prove that the defendant aided and abetted the commission of murder. *The crime of murder continues until the perpetrators have actually reached a temporary place of safety.* The perpetrators have reached a temporary place of safety if they have successfully escaped from the scene and are no longer being chased." (Italics added.)
>
> Defendant now contends the trial court violated his due process rights by giving this instruction, the italicized portion of which he says erroneously allowed the jury to find aiding and abetting liability even if defendant did not form the requisite intent, or perform the necessary act, until after the murder had already been completed. We conclude the error was harmless.[24]
>
> We independently assess whether an instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) As given here, CALCRIM No. 3261 does not. "[A] murder ends with the death of the victim." (*People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1397; accord, *People v. Celis* (2006) 141 Cal.App.4th 466, 471.) The escape rule[25] does not apply to a determination of aider and abettor

---

[24] Jury instruction requests were emailed to the court and opposing counsel, and the jury instruction conference was not reported. Thus, we cannot tell whether either party requested the instruction. Insofar as the record shows, there was no objection to it. Because the Attorney General agrees with defendant (as do we) that the claim is cognizable on appeal despite the apparent lack of objection, we do not address defendant's alternative claim that defense counsel's failure to object constituted ineffective assistance of counsel.

[25] "The 'escape rule' defines the duration of the underlying felony, *in the context of certain ancillary consequences of the felony* [citation], by deeming the felony to continue until the felon has reached a place of temporary safety. [Citation.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 208, italics added.) It arises in the context of felony murder when there is evidence that the fleeing felon may have reached a place of temporary safety prior to the commission of a killing. (See *People v. Wilkins* (2013) 56 Cal.4th 333, 348). It arises in "other contexts requiring proof that an act occurred in the commission of a crime—such as inflicting great bodily injury in the course of commission of a

liability (*People v. Cooper* (1991) 53 Cal.3d 1158, 1169; see *People v. Gomez* (2008) 43 Cal.4th 249, 256 & fn. 5), even though "the temporal threshold for establishing guilt—a fixed point in time at which all elements of the substantive offense are satisfied so that the offense itself may be considered to have been '*initially* committed' rather than simply attempted—is *not* synonymous with the 'commission' of that crime for the purpose of determining aider and abettor liability. [Citation.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1040; *People v. Cooper, supra,* at p. 1164.)

"It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' [Citations.]" (*People v. Montoya, supra,* 7 Cal.4th at p. 1039.) "In a simple murder case, i.e., not involving the felony-murder rule, a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the victim dies. After the victim dies, what would be aiding and abetting legally turns into being an accessory 'after a felony has been committed.' (§ 32.)" (*People v. Celis, supra,* 141 Cal.App.4th at pp. 473–474.) Defendant "cannot be retroactively culpable for the killing of [James] if it occurred before [defendant's] becoming an aider and abettor. Any other holding would ignore the primary rationale for punishing aiders and abettors as principals, which is to deter them from aiding or encouraging the commission of offenses. [Citations.]" (*People v. Esquivel, supra,* 28 Cal.App.4th at p. 1397.)

Permitting aider and abettor liability to be predicated on intent formed after the murder was completed constitutes an invalid legal theory. Such an error generally requires reversal, "absent a basis in the record to find that the verdict was actually based on a valid ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129, fn. omitted.) Had the issue before the jury been whether defendant directly aided and abetted murder, the rule of reversal might well apply here.[26]

However, "[i]n assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' [Citations.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; accord, *Estelle v. McGuire, supra,* 502 U.S. at p. 72.) " ' "[A] single instruction to a jury may not be judged in artificial isolation...." ' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The issue before the jury was not whether defendant directly aided and abetted murder, but whether he directly aided and abetted a specified assaultive crime of which murder was a natural and probable consequence. Jurors were expressly told that before they could decide whether defendant was guilty of murder as an aider and abettor, they had to decide whether he was guilty of one of the specified assaultive offenses. " 'Jurors are, of course, presumed to follow the instructions given by the court.' [Citation.]" (*People v. Murtishaw*(1989) 48 Cal.3d 1001,

---

[26] No evidence was presented at trial concerning the actual time of James's death. Although it appears he was still alive for at least a short time after defendant and the other participants left the scene, jurors would have had no way of determining for how long.

crime [citation], kidnapping for purposes of robbery [citation], and use of a firearm in the commission of a robbery [citation]." (*Id.* at p. 341; see also *People v. Portillo* (2003) 107 Cal.App.4th 834, 843.)

1044.) They were instructed that to find aiding and abetting, defendant had to form the requisite intent before or during the commission of the crime. Significantly, they were never told any of the specified assaultive crimes continued until the perpetrators reached a place of temporary safety. Jurors were further told that to prove defendant guilty of murder as an aider and abettor, the People had to prove (1) defendant was guilty of one of the specified assaultive offenses, either as a perpetrator or as an aider and abettor; (2) during the commission of said specified assaultive offense, a coparticipant in that offense committed the crime of murder; and (3) a reasonable person in defendant's position would have known the commission of the murder was a natural and probable consequence of the commission of the specified assaultive offense. Murder was defined because jurors had to decide whether it was committed by a coparticipant in the assaultive offense.[27] (See *People v. Prettyman* (1996) 14 Cal.4th 248, 267 (*Prettyman* ).) A finding murder was committed required jurors to find commission of an act that caused the death of another person. On the evidence presented, the requisite act could only have been the stabbing of James, the timing of which could not have been impacted by CALCRIM No. 3261. Under the circumstances, CALCRIM No. 3261 did not present jurors with an erroneous legal theory; it was irrelevant.

As given, the first sentence of CALCRIM No. 3261 stated: "The People must prove that the defendant aided and abetted the commission of *murder.*" (Italics added.) However, jurors were told to consider the instructions together. We presume they did so. (*People v. Murtishaw, supra,* 48 Cal.3d at p. 1044.) Read in context of the instructions as a whole, the first sentence merely clarified the *ultimate* issue was whether defendant aided and abetted murder; other instructions made it clear jurors could not go immediately to that issue, but first had to decide whether defendant perpetrated or aided and abetted a specified assaultive crime and then if murder was a natural and probable consequence of that crime. If jurors did not find defendant perpetrated or aided and abetted a specified assaultive crime, there is no way, under the instructions as a whole and the evidence at trial, they could have found him guilty of murder based solely on what occurred on the way back to the hotel.

We recognize the prosecutor briefly referred to CALCRIM No. 3261 in arguing to the jury: "[James] gets hit with the knife, he goes down, and the defendant drives away. What's important is this isn't something—this is the act of murder still in progress. The crime of murder hasn't ended yet. It doesn't end until they get back to Santa Nella and there is a jury instruction that tells you that." However, there was no other mention of the instruction. More importantly, the prosecutor never suggested defendant could be guilty if he did not form the intent to aid and abet until he reached Santa Nella or until James died. Nor did he argue defendant could be guilty simply by driving away or simply aiding and abetting an escape of the perpetrators. Rather, he argued defendant was guilty of murder by aiding and abetting the target crime of assault with a deadly weapon because he assisted in the fight in the bar and because he was the getaway driver. This was a valid theory for murder liability based on aiding and abetting principles.

The following occurred during defense counsel's summation:

---

[27] Although the instructions on murder referred to "the defendant," the prosecutor clarified, in his opening argument, that jurors should "replace the 'defendant' with 'perpetrator' or 'co-participant,' " because "they all aided and abetted each other...."

21

> "[DEFENSE COUNSEL:] And he had to know that the commission of the crime, before or during the commission of the crime defendant intended to aid and abet the perpetrator. That he intended to, before and during the crime he intended to aid the perpetrator. And the reason I think that's important is don't be confused by the fact that my client got in his truck and drove back to the hotel, and that is aiding and abetting. That is not. He had to know before the crime was committed and he had to be participating during the crime.
>
> "There is another crime if you felt he didn't know before and he didn't know what was going on during but say he left the place to avoid something at that point left the place, that is aiding and abetting possibly after the fact, which is not murder, that's totally different case. Totally different scenario.
>
> "[PROSECUTOR]: Objection, Your Honor. Misstates the law.
>
> "THE COURT: Yeah. Sustained."

Defendant says the prosecutor's objection and trial court's ruling, coupled with the instructional error, curtailed defense counsel's ability to argue a key aspect of the defense—that to be guilty, defendant had to have formed the requisite intent before the drive back to the hotel. We disagree. The prosecutor did not object to defense counsel's argument that defendant had to intend to aid and abet before or during the commission of the crime, and that merely getting in the truck and driving back to the hotel was not aiding and abetting. Rather, the objection was to defense counsel's apparent attempt to bring the crime of accessory into the picture.[28] Because James was still alive when defendant left the scene, he could not be guilty of accessory after the fact to murder. (*People v. Celis, supra,* 141 Cal.App.4th at pp. 471–472.) Further, the crime of accessory after the fact was not charged, nor was it a lesser included offense of the murder charge. Hence, any suggestion the jurors might convict defendant of something other than murder was incorrect. (See *People v. Jennings* (2010) 50 Cal.4th 616, 668.) The objection to this suggestion was properly sustained.

Finally, we disagree with defendant's prejudice argument that the instructional error permitted the jury to convict him under an erroneous legal theory under *People v. Guiton, supra,* 4 Cal.4th at page 1122. There is no way the jury could have found defendant guilty on the basis that it might have found he first formed the intent to aid and abet the perpetrators on the way back to the hotel by using his vehicle to "draft[ ]" the suspect Tahoe vehicle. This theory was never suggested, let alone relied upon, by the prosecution as an alternative theory for conviction. As such, "the *Green* rule" as explained in *Guiton* does not apply here. (*Id.* at p. 1121 [explaining the prejudice rule adopted in *People v. Green* (1980) 27 Cal.3d 1 where the prosecutor expressly urged a kidnapping verdict on an invalid alternate theory of asportation].)

The erroneous giving of CALCRIM No. 3261 was harmless. (See *People v. Wilkins, supra,* 56 Cal.4th at pp. 348–351; *People v. Nguyen* (2000) 24 Cal.4th

---

[28] Section 32 provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

756, 765; *People v. Hagen* (1998) 19 Cal.4th 652, 670.) Defendant is not entitled to reversal.

<u>Silva</u>, 2014 WL 350590, at *11–15 (footnotes in original).

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." <u>Estelle v. McGuire</u>, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." <u>Id.</u> The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Estelle</u>, 502 U.S. at 72 (internal quotation marks omitted) (quoting <u>Cupp</u>, 414 U.S. at 147).

Here, the California Court of Appeal found that the trial court erred under state law by instructing the jury with a modified, truncated version of CALCRIM No. 3261. This determination is binding on this Court. <u>See</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). However, the California Court of Appeal found the error was harmless. Therefore, the Court will proceed to determine whether the California Court of Appeal's harmlessness determination itself was unreasonable. <u>See</u> <u>Ayala</u>, 135 S. Ct. at 2199. As discussed above, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" <u>Neder</u>, 527 U.S. at 15 (quoting <u>Chapman</u>, 386 U.S. at 24).

The state court considered the modified, truncated version of the CALCRIM No. 3261 instruction in the context of the jury instructions as a whole. <u>See</u> <u>Estelle</u>, 502 U.S. at 72 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be

considered in the context of the instructions as a whole and the trial record.") (quoting <u>Cupp</u>, 414 U.S. at 147)). Specifically, the jury was instructed:

> Before you may decide whether the defendant is guilty of Murder as an aider and abettor, you must decide whether he is guilty of Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery.
>
> To prove that the defendant is guilty of Murder as an aider and abettor, the People must prove that:
>
>> 1. The defendant is guilty of Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery either as a perpetrator or as an aider and abettor;
>>
>> 2. During the commission of the Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery, a coparticipant in that Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery committed the crime of Murder;
>>
>> AND
>>
>> 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of the commission of the Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery.
>
> A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.
>
> A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the Murder was committed for a reason independent of the common plan to commit the Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery, then the commission of Murder was not a natural and probable consequence of Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery.
>
> To decide whether crime of Murder was committed, please refer to the separate instructions that I will give you on that crime.
>
> The People are alleging that the defendant originally intended to act as a perpetrator or intended to aid and abet the commission of Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery.
>
> If you decide that the defendant aided and abetted one of these crimes and that Murder was the natural and probable result of that crime, the defendant is guilty of Murder. You do not need to agree about which of these crimes the defendant aided and abetted.

(4 CT 706).

The jury was specifically instructed that they must decide whether Petitioner perpetrated or aided and abetted Assault with a Deadly Weapon or with Force Likely to Procedure Great Bodily Injury, Assault, or Battery *before* they decide whether Petitioner is guilty of Murder as an aider and abettor. A jury is presumed to follow the court's instructions. Weeks, 528 U.S. at 234. Thus, the state court reasonably concluded that in light of the instructions as a whole and the evidence presented at trial, if the jury did not find that Petitioner perpetrated or aided and abetted the assaultive crime at the bar, there was no way the jury could have found Petitioner guilty of murder on the basis that Petitioner formed the intent to aid and abet the perpetrators on the way back to the hotel.

Based on the foregoing, the Court finds that the state court's denial of Petitioner's due process claim with respect to erroneously instructing the jury with CALCRIM No. 3261 was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

### B.  Inclusion of Legal Memorandum with Trial Exhibits Given to the Jury

In his third claim for relief, Petitioner asserts that the jury's inadvertent receipt of a legal memorandum, which had extensive discussion of the natural and probable consequences doctrine, violated his due process rights. (ECF No. 1 at 28). Respondent argues that the trial court's inadvertent inclusion of the legal memorandum with the trial exhibits given to the jury did not have a substantial and injurious influence or effect on the verdict. (ECF No. 17 at 40).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's due process claim regarding the inadvertent inclusion of a legal memorandum with the trial exhibits given to the jury, the California Court of Appeal stated:

### Inclusion of Legal Memorandum with Exhibits

Defendant claims his due process rights were violated when the jury was inadvertently given a copy of a legal memorandum discussing the natural and probable consequences doctrine. He says the issue should be treated as instructional in nature; hence, he had no burden to prove jurors actually read the memorandum. Alternatively, he says trial counsel was ineffective for failing to attempt to obtain such information from the jurors. We find no cause for reversal.

### A. Background

As previously stated, defendant's jury was instructed on the natural and probable consequences doctrine. Jurors were also instructed that during trial, several items were received into evidence as exhibits; they could examine whatever exhibits they thought would help them in their deliberations; and the exhibits would be sent to the jury room when they began to deliberate. After the jury was directed to retire and begin deliberations, the trial court again noted the exhibits would be brought in to them along with the verdict forms.

After the jury returned its verdicts, jurors were told they could discuss the case with the attorneys or with anyone else, but were not obligated to do so. They were told that if they did not want to talk to the attorneys, to say so, and the attorneys were ordered to respect those wishes and cease contact. The attorneys and their representatives were further ordered not to contact jurors "at any unreasonable time or place."

The following day, the trial court sent an email to both counsel informing them that, as the court clerk was collecting the exhibits from the jury room, she found "intermixed with the exhibits" a memorandum that the court had prepared for its own use. Both counsel were provided with a copy of the memorandum, which is also contained in the clerk's transcript on appeal. As the trial court subsequently stated for the record, and our independent comparison has confirmed, it consisted solely of verbatim excerpts from both the majority opinion, and Justice Brown's concurring and dissenting opinion in *Prettyman, supra,* 14 Cal.4th 248. It contained no independent analysis. The court advised counsel it believed the memorandum "got stuck with the predicate offenses."[29]

Defendant raised "[j]urors in possession of outside materials during deliberations" as a ground upon which he moved for a new trial. In opposition, the prosecutor argued there was no juror misconduct. The prosecutor asserted the memorandum was neither evidence nor received from an outside source; there was no showing the jury read or discussed it.

After argument on the motion, the court reiterated the memorandum was merely an excerpt of portions of *Prettyman* that the court "cut and pasted" for its own use in preparing the jury instructions. The court expressed its belief "that during the course of [the court's] preparation of jury instructions and particularly looking at the predicate offenses that somehow this document got intermixed with the predicate offenses and that inadvertently was taken into the jury room." The court

---

[29] It is unclear if the court was referring to the certified copies of court records the prosecutor introduced through his gang expert to establish the Mongols were a criminal street gang.

found no juror misconduct, because the jurors did not seek to obtain information from any outside source and the document was not evidence. The court considered the situation as possibly being akin to an instructional error because the memorandum amplified what the natural and probable consequences doctrine was and the reason for it, but found it did not mislead the jury "on the principles." The court further observed it was defendant's burden to show jurors saw the document, and it corrected defense counsel's mistaken belief that the court had ordered no contact with the jurors. Although the court's statement, as set out in the reporter's transcript, is somewhat unclear, it appears to have found any error harmless beyond a reasonable doubt.[30] As previously noted, the motion for new trial was denied.

## B. *Analysis*

The parties disagree on the appropriate standard of review. Defendant argues that, although he raised the issue now before us with a new trial motion, the substance of the error was the same as an error in jury instructions; hence, we should employ the de novo standard of review applicable to a claim of instructional error. (See *People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) The Attorney General, on the other hand, says we should use the deferential abuse-of-discretion standard applicable to review of a trial court's ruling on a motion for a new trial. (See *People v. Thompson* (2010) 49 Cal.4th 79, 140.)

If we needed to determine the appropriate standard of review, the issue would be complicated by the possibility of juror misconduct. In *People v. Clair* (1992) 2 Cal.4th 629, 667, the California Supreme Court applied the abuse-of-discretion standard to the defendant's claim the trial court erred in denying his new trial motion on the ground the jury received evidence out of court.[31] In *People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*), however, the state Supreme Court stated it independently reviewed a trial court's denial of a new trial motion based on alleged juror misconduct.[32]

Defendant's contention fails whichever standard we apply, and regardless of whether we treat the legal memorandum in the jury room as potential jury misconduct or as a species of instructional error. However we view the matter, a prerequisite to defendant's claim is a showing one or more jurors actually read the memorandum. Defendant failed to make any such showing.[33]

---

[30] According to the reporter's transcript, the court stated: "The Court views it as an application of instruction and that there was not a harmless error that would create some reasonable doubt about the defendant receiving a fair trial or that the jury did not base its decision on the law as applied to the case based on the facts and evidence as they found them to be in the trial."

[31] See section 1181, subdivision 2. The trial court's misdirection of the jury on a point of law also furnishes grounds for a new trial motion. (*Id.,* subd. 5.)

[32] The *Gamache* court further observed: "Juror misconduct gives rise to a presumption of prejudice [citation]; the prosecution must rebut the presumption by demonstrating 'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment' [citations]. In contrast, in the absence of misconduct, the burden remains with the defendant to demonstrate prejudice under the usual standard for ordinary trial error. [Citations.]" (*Gamache, supra,* 48 Cal.4th at p. 397.) The court explained that when jurors consider extrinsic evidence that finds its way into the jury room through party or court error, such as when a transcript or exhibit "never intended for the jury's eyes" is inadvertently provided to the jury, there is no misconduct, but only ordinary error. When, by contrast, a juror actively or even passively obtains information about a case from *outside* sources, it is considered juror misconduct that gives rise to a presumption of prejudice, even if not truly blameworthy conduct. (*Id.* at pp. 397–398.)

[33] On the record before us, we cannot assume the memorandum was read, or even that jurors were aware of its presence. Jurors did not ask to examine any or all of the trial exhibits. Instead, those exhibits were all sent in to them

"To succeed [on a claim of jury misconduct], defendant must *show* misconduct on the part of a juror...." (*People v. Marshall* (1990) 50 Cal.3d 907, 949, italics added; see, e.g., *Gamache, supra,* 48 Cal.4th at pp. 395–396 [trial court held evidentiary hearing that revealed jury watched unadmitted videotape inadvertently sent in to jury]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1070 [juror admitted in a declaration that she consulted dictionary before penalty deliberations]; *People v. Williams* (2006) 40 Cal.4th 287, 330 [after verdict, several pages copied from Bible were discovered in jury room; defendant's motion for new trial on grounds of jury misconduct was supported by declarations from two jurors]; *People v. Clair, supra,* 2 Cal.4th at pp. 665–667 [upon realizing unredacted audiotape and transcript were sent in to jurors, trial court examined jurors to determine what, if anything, jurors had heard or read]; *People v. Cooper* (1991) 53 Cal.3d 771, 833–835 [jurors informed court they knew of information contained in material inadvertently admitted into evidence]; *People v. Karis* (1988) 46 Cal.3d 612, 642–643 [defendant's motion for new trial based on declaration by juror stating another juror consulted dictionary during deliberations]; *U.S. v. Vasquez* (9th Cir.1979) 597 F.2d 192, 193 [official court file inadvertently left in jury room during deliberations; trial court questioned jurors and learned most had at least glanced at file's contents].) Even hearsay is not enough (*People v. Hayes* (1999) 21 Cal.4th 1211, 1256), and defendant did not even present that much, but instead merely relied—as he does on appeal—on the fact the memorandum was sent into the jury room with the exhibits.

The parties have not called our attention to, and we have not found, any case in which it has been assumed, on such a bare record, that jurors had actual knowledge of assertedly improper information. We will not overturn a criminal conviction on such a meager showing. Nor will we dispense with the need for an adequate showing on the ground what happened was tantamount to instructional error and a defendant raising an issue of instructional error need not prove the jury relied on the erroneous instruction. Even assuming a defendant need not prove the jury *relied* on the erroneous instruction, there must be something in the record from which a reviewing court can conclude—not merely speculate—the jury *received* the instruction in such a way jurors were aware of its contents.

Under any standard, the trial court did not err in denying defendant's new trial motion, and defendant has shown no cause for reversal on appeal.

Silva, 2014 WL 350590, at *15–17 (footnotes in original).

Assuming without deciding that a constitutional error occurred with respect to the jury's inadvertent receipt of the legal memorandum, the error was harmless under Brecht. See Brecht, 507 U.S. at 637 (holding habeas relief unavailable unless the trial error "had substantial and injurious effect or influence in determining the jury's verdict" and "resulted in 'actual prejudice'"). In the instant case, the legal memorandum that was inadvertently included with the

---

automatically. (Compare *People v. Jackson* (1996) 13 Cal.4th 1164, 1213 [jurors specifically requested to see transcript that, due to clerical error in transposing exhibit numbers of edited and unedited versions, may have been version not meant for jury].) They were not told they had to review any or all exhibits; they were simply told they could examine whatever exhibits they thought would help them. Under the circumstances, we have no way of knowing—or even surmising—which, if any, of the exhibits jurors reviewed.

trial exhibits given to the jury consisted of verbatim excerpts of the majority opinion and Justice Brown's concurring and dissenting opinion in <u>People v. Prettyman</u>, 14 Cal.4th 248 (Cal. 1996), regarding the natural and probable consequences doctrine. (4 CT 770–76). The majority opinion excerpt discussed that when applying the natural and probable consequences to aiders and abettors, the jury must find that the defendant aided and abetted the commission of a target or predicate crime and that the offense actually committed was a natural and probable consequence of the target or predicate crime. (4 CT 771). The majority held that if the jury was instructed on the natural and probable consequences doctrine to hold a defendant liable as an aider and abettor, the trial court had a duty to issue instructions identifying and describing each potential target or predicate crime. (4 CT 773). The excerpt of Justice Brown's concurring and dissenting opinion expressed that identification and description of the elements of the target or predicate crimes were immaterial to the natural and probable consequences doctrine. (4 CT 773). It also discussed the definition and meaning of natural and probable consequences, and Justice Brown noted that the majority holding would result in further confusion. (4 CT 774–75). Although the legal memorandum provided a more in-depth discussion of the natural and probable consequences doctrine, it did not contradict or negate the instruction given to the jury. Given that a jury is presumed to follow its instructions, <u>Weeks</u>, 528 U.S. at 234, Petitioner has not established that the inadvertent receipt of the legal memorandum "had substantial and injurious effect or influence in determining the jury's verdict," <u>Brecht</u>, 507 U.S. at 637.

Based on the foregoing, the Court finds that Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

### C.  Ineffective Assistance of Counsel

In his fourth claim for relief, Petitioner asserts that to the extent it was Petitioner's burden to establish that the jury actually viewed the legal memorandum, his trial counsel provided ineffective assistance in failing to acquire contact information and interview jurors. (ECF No. 1 at 30). Respondent argues that the state court's denial of this claim was reasonable and in accord with Supreme Court precedent. (ECF No. 17 at 46).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> Defendant says, however, that if the burden was on him to demonstrate the jury actually viewed the memorandum, then trial counsel was ineffective for failing to interview jurors or at least obtain juror contact information.

> The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.)

> Defense counsel misinterpreted the trial court's order that the attorneys and their representatives not contact jurors at any unreasonable time or place as meaning there could be no contact at all. A reasonably competent attorney would have been aware of the procedures, which have been set out in Code of Civil Procedure sections 206, subdivision (g) and 237 for more than 15 years, by which juror contact information may be sought. (See, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 603–604 [discussing procedure under previous version of Code Civ. Proc., § 237]; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 989–990 [noting differences between pre–1996 and post–1996 procedures under Code Civ. Proc., §§ 206, subd. (g), 237].) We, however, have no way of knowing what defense counsel might have discovered had he undertaken appropriate action. Defendant has not, therefore, shown he was prejudiced by counsel's deficient performance. Defendant's claim of ineffective assistance of counsel fails on this appeal. (See *People v. Blair* (2005) 36 Cal.4th 686, 729.)

Silva, 2014 WL 350590, at *17.

1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is

Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging

ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

2. Analysis

Petitioner does not establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As discussed in section IV(B), supra, the jury's inadvertent receipt of the legal memorandum did not have a prejudicial impact on the jury's verdict. Therefore, even if trial counsel had acquired the jurors' contact information, interviewed them, and established that the

1  jury actually viewed the legal memorandum, the result of the proceeding would not have been
2  different.

3          Based on the foregoing, the Court finds that the state court's denial of Petitioner's
4  ineffective assistance of counsel claim was not contrary to, nor an unreasonable application of,
5  clearly established federal law, nor was it based on an unreasonable determination of fact. The
6  decision was not "so lacking in justification that there was an error well understood and
7  comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562
8  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it
9  should be denied.

10         **D. Cumulative Error**

11         In his fifth claim for relief, Petitioner asserts that the cumulative effect of the trial court's
12  errors was to deprive Petitioner of a fair trial, in violation of due process. (ECF No. 1 at 35).
13  Respondent argues that the state court's denial of this claim did not offend any Supreme Court
14  precedent. (ECF No. 17 at 48).

15         This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate
16  District, which denied the claim in a reasoned decision. The California Supreme Court
17  summarily denied Petitioner's petition for review. As federal courts review the last reasoned
18  state court opinion, the Court will "look through" the California Supreme Court's summary
19  denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at
20  2276; Ylst, 501 U.S. at 806.

21         In denying Petitioner's cumulative error claim, the California Court of Appeal stated:

22         Defendant says the cumulative effect of the trial court's errors deprived him of a
           fair trial. (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 844–845; *People v.*
23         *Jasso* (2012) 211 Cal.App.4th 1354, 1378.) "To the extent that there are a few
           instances in which we found ... the existence of error, we concluded that no
24         prejudice resulted. We reach the same conclusion after considering [their]
           cumulative effect." (*People v. Booker* (2011) 51 Cal.4th 141, 195.)
25

26  Silva, 2014 WL 350590, at *18.

27         "The Supreme Court has clearly established that the combined effect of multiple trial
28  court errors violates due process where it renders the resulting criminal trial fundamentally

unfair. . . . even where no single error rises to the level of a constitutional violation or would independently warrant reversal." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." <u>Ybarra v. McDaniel</u>, 656 F.3d 984, 1001 (9th Cir. 2011) (citing <u>Parle</u>, 505 F.3d at 933). For example, in <u>Parle</u>, "*all* of the improperly excluded evidence . . . supported Parle's defense that he lacked the requisite state of mind for first-degree murder; at the same time, *all* of the erroneously admitted evidence . . . undermined Parle's defense and credibility and bolstered the State's case." <u>Parle</u>, 505 F.3d at 930.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681 (1986). All the errors raised by Petitioner concerned aiding and abetting liability and the natural and probable consequences doctrine. However, the errors did not refute the instruction given to the jury that they must decide whether Petitioner perpetrated or aided and abetted Assault with a Deadly Weapon or with Force Likely to Produce Great Bodily Injury, Assault, or Battery *before* they decide whether Petitioner is guilty of Murder as an aider and abettor, and Petitioner has not overcome the presumption that a jury follows its instructions. Therefore, the state court's denial of Petitioner's cumulative error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

1    This Findings and Recommendation is submitted to the assigned United States District

2 Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

3 Rules of Practice for the United States District Court, Eastern District of California. Within

4 **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

5 written objections with the court and serve a copy on all parties. Such a document should be

6 captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

7 objections shall be served and filed within fourteen (14) days after service of the objections. The

8 assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

9 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may

10 waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839

11 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

12

13 IT IS SO ORDERED.

14 Dated:  __**March 30, 2017**__

         _____
         UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28